# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

LON S. WALKER,         )
                     )
    Petitioner,         )
                     )     NO. 2:03-00096
                     )     JUDGE HAYNES
VIRGINIA LEWIS, Warden,   )
                     )
    Respondent.     )

## M E M O R A N D U M

Petitioner, Lon S. Walker, filed this pro se petition for writ of habeas corpus under 28

U.S.C. § 2254, seeking to set aside his state court conviction for second degree murder for which

he received a sentence of twenty (20) years. After a review of the file, the Court appointed the

Federal Public Defendant to represent Petitioner and two amended petitions were filed. (Docket

Entry Nos. 28 and 61). Petitioner's specific claims are: (1) the State's proof was insufficient to

support his conviction; (2) Petitioner's trial counsel provided ineffective assistance for his

failures: to object to the trial court's instructions about a state witness; to object to the trial

court's ruling limiting the jury's consideration of a state witness's inconsistent written statement

for impeachment only; to object to the prosecutor's comments during the examination of a

defense witness and to other improper remarks and argument by the prosecutors; and to secure

expert proof to evaluate the gun residue evidence; (3) the prosecutor commented on Petitioner's

Fifth Amendment right not to testify; (4) a prosecutor instructed a witness not to speak with

defense counsel; (5) the prosecutors withheld exculpatory evidence in violation of Brady v.

Maryland, 373 U.S. 83 (1963); and (6) Petitioner is actually innocent of the crime because the

victim committed suicide. (Docket Entry No. 61, Second Amended Petition at pp. 26, 33, 40-49,

49, 50).

## A. Procedural History

A jury found Petitioner guilty of second degree murder and the state trial court sentenced Petitioner to twenty (20) years. Petitioner appealed his conviction to the Tennessee Court of Criminal Appeals that affirmed his conviction. See Walker v. State, 1999 WL 219629 (Tenn. Ct. Crim. App. April 16, 1999). The Tennessee Supreme Court denied his application for review on October 11, 1999. Id.

On February 17, 2000, Petitioner filed his state post-conviction and after an evidentiary hearing, the state trial court denied his petition. On appeal, the Tennessee Court of Criminal Appeals affirmed. Walker v. State, 2002 WL 3152065 (Tenn. Ct. Crim. App. Nov. 13, 2002). The Tennessee Supreme Court denied his application for review on March 17, 2003. Id.

On September 4, 2003, Petitioner filed this action and requested discovery as well as an evidentiary hearing. In support of his prosecutorial misconduct claims, Petitioner asserted that Ben Fann, one of the prosecutors, made inappropriate and prejudicial remarks from counsel's table while defense witnesses were on the stand, but those remarks were omitted from the trial transcript. Petitioner filed the tapes of the trial proceedings and contends that the tapes reflect Fann's remarks. Petitioner also moved to depose Fann and Lillie Ann Sells, another state prosecutor who was at the prosecution table with Fann. Respondent opposed Petitioner's motion to conduct discovery as unnecessary and his motion to amend his petition to add new claims that Respondent contends are procedurally defaulted as time-barred under 28 U.S.C. § 2244(d)(1) and precluded by Tenn. Code Ann. § 40-30-102 (a) and (c) and Tenn. R. App. P. 36(a). (Docket Entry No. 57). The Court overruled Respondent's objections and permitted the Petitioner's

2

amendment and related discovery. (Docket Entry Nos. 64, 65). Petitioner also requested an evidentiary hearing, but after reviewing Petitioner's evidentiary submissions and the State record, the Court concludes that an evidentiary hearing is unnecessary.

## B. Review of the State Record

### 1. Findings of Fact

The Tennessee Court of Criminal Appeals summarized the facts[1] underlying the Petitioner's second degree murder conviction as follows:

> On Saturday, October 14, 1995, shortly after twelve noon, James "Howard" Harp and his brother Jerry traveled by taxi to the mobile home of the appellant. The Harp brothers had been acquainted with the appellant for approximately one month. The three men began drinking and, after realizing their stock of alcohol was almost depleted, drove to Jackson County to purchase additional alcohol. On the way back to the Cookeville residence of the appellant, the trio stopped at the home of Stacy Patzer, a "drinking buddy" of the appellant, who lived alone while her husband was in jail. Stacy had never before met the Harp brothers. After enjoying a few drinks with her visitors, Stacy agreed to accompany the men back to the appellant's mobile home to continue their socializing.
>
> After arrival at the appellant's residence, Jerry Harp observed that both his brother, Howard, and the appellant were "pretty well lit." While the others continued to imbibe, Jerry Harp left the appellant's home twice: once to visit a friend and once to drive Stacy home to check on her dogs. Upon returning from the trip to Stacy's home, Jerry noticed Howard and Stacy flirting with one another. Howard kissed Stacy and sat in her lap. Apparently, the casual flirtation between Howard and Stacy upset the appellant, who informed Jerry Harp that he was mad that Stacy and his brother were "hitting it off." Later that evening, the appellant showed Jerry his black snubnose .38 pistol with the filed-down hammer. Jerry Harp subsequently left the trailer and did not return.
>
> Eric Christensen, a friend of the appellant's, stopped by the trailer after completing his shift as a cook at Waffle House. When Christensen arrived, Jerry Harp had already left and the appellant, Stacy, and Howard were drinking alcohol and

---

[1]State appellate court opinion can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and these findings have a statutory presumption of correctness 28 U.S.C. § 2254(d).

3

listening to music. According to Christensen, Howard and Stacy were extremely intoxicated, while the appellant only had a "buzz." Stacy was using the telephone and appeared upset. Howard was trying to comfort her. The appellant expressed his displeasure over Howard's efforts to console Stacy and "told Howard to mind his own business." He then shook his fists at Howard and threatened "that someone was going to get hurt." Christensen left shortly thereafter.

Later that evening, the appellant left the mobile home and wandered over to the home of his neighbor, Benjamin Johnson. Johnson was working outside when the appellant, carrying a rum and Coke, appeared. The appellant told Johnson that he might need his help in a little while in "kicking this guy's ass." Johnson laughed off the appellant's comments as a joke and changed the subject.

At about 10:50 p.m., Stacy was sitting on a stool on the living room side of the bar dividing the living and kitchen areas. Howard was standing less than three feet away, facing her. The appellant was standing at the end of the bar on the kitchen side opposite Howard. Immediately before the shooting, Stacy related "we were all sitting, talking, laughing, having a good time." Suddenly and without any warning, Stacy "caught a glimpse" of a gun in the appellant's hand. The appellant "turned and then he turned back around and he brought [the gun] up to Mr. Harp's temple ... [and] shot Mr. Harp." After being shot, the victim fell straight back onto the floor.

A very intoxicated Stacy screamed, picked up the telephone, and attempted to dial "911." Her efforts to obtain assistance were futile as the appellant pressed the button on the telephone to cut off her call and told her that "he would take care of it; Howard was dead." The appellant told Stacy that Howard had shot himself. Stacy ran to the bathroom and locked the door. The "911" operator called back and Stacy answered the telephone located in the bathroom. She informed the operator that Howard Harp had committed suicide.

When Cookeville Police Officers arrived at the appellant's trailer, they found Howard Harp laying in a pool of blood, barely breathing. He was immediately transported to a hospital, where he subsequently died from a single gunshot wound to the head. Stacy Patzer, obviously intoxicated, was hysterical, screaming, and crying. The appellant was standing in the driveway and calmly informed officers that Howard had committed suicide.

In processing the crime scene, officers found a .38 Smith and Wesson handgun in the kitchen sink underneath a Coca-Cola cup. The pistol contained one spent round and five live rounds. The weapon also had a filed-off hammer. When questioned by the officers, the appellant denied ever seeing the weapon before the shooting and stated that Howard Harp must have brought the weapon with him.

4

The appellant also explained that, at the time of the actual shooting, he was down the hall in the bathroom, so he did not know exactly what had happened. Contemporaneously, Stacy made repeated comments that Howard had committed suicide. She reiterated these statements to her husband, who was in jail, and to another friend. However, two days after the shooting, Stacy Patzer recanted her previous statements regarding the incident and informed Detective James Lane that the appellant had shot Howard Harp. She explained that her prior statements were influenced by her intoxicated and hysterical state and that, when she was told by the appellant "that [Howard] had committed suicide, ... I guess I just wanted to believe it."

At trial, evidence was introduced that the gun used in the shooting death of Howard Harp belonged to the appellant. The original owner of the weapon verified the weapon's unique serial number, "666," and the fact that the hammer had been filed down. He testified that he had sold the unregistered weapon to the appellant several months prior to the incident. Additionally, James Harp testified that the gun recovered in the kitchen sink after the shooting was the very same weapon that the appellant had shown him earlier that evening. Red splatters on the appellant's t-shirt, which he explained as spaghetti sauce, were later determined to be human blood. No fingerprints were recovered from either the weapon or the ammunition, and, gunshot residue analysis revealed "elements indicative of gunshot residue absent" as to both the appellant and Stacy and "inconclusive" as to Howard Harp.

The defense introduced voluminous records to illustrate Howard Harp's history of psychological problems and suicidal tendencies. Indeed, his brother Jerry conceded on cross-examination that, on the morning of the shooting, Howard had stated that he was going to kill himself. Jerry also conceded that almost every time his brother consumed alcohol he would become depressed and talk about killing himself. The defense also attempted to discredit Stacy Patzer's in-court testimony by implying that she only swayed from her original report of "suicide" in an effort to assist her husband in his own criminal charges.

Walker, 1999 WL 219629 at *1-3.

In Petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeals made additional factual findings that are relevant here.

By approximately 10:50 p.m., Ms. Patzer was sitting on a bar stool on the living room side of the bar, and Howard was standing less than three feet from Ms. Patzer, facing in her direction. Petitioner was standing opposite Howard on the kitchen side of the bar. Initially, Ms. Patzer stated that she caught a movement out

5

of the corner of her eye, and she turned to look at the Petitioner. When she looked
back, Howard was on the floor, on his back with a pool of blood beneath his head.
Although she testified that there was no blood in the room except beneath
Howard's head, her slacks were splattered with blood, and bits of brain matter and
blood matted her hair.

Ms. Patzer began screaming. She picked up the phone in front of her and dialed
911. Before the call was answered, Petitioner pressed the disconnect button on the
receiver and said they would handle the situation themselves. Ms. Patzer ran
screaming to the bathroom and locked herself in. Pursuant to normal procedure
when an emergency call is received, the 911 operator called back, and Ms. Patzer
answered the call on the bathroom telephone. She told the operator that Howard
Harp had just committed suicide.

Police were dispatched to the scene and arrived in approximately two minutes.
Ms. Patzer was still in the bathroom and the Petitioner was outside. At the scene,
officers found a .38 caliber handgun in the kitchen sink beneath a Coca-Cola cup.
The gun had one spent round and five live rounds. The counter by the sink was
wet. The Petitioner denied knowing where the gun came from, and said he was
down the hall when the shot occurred. Ms. Patzer repeated several times that
Howard had shot himself.

Ms. Patzer and Petitioner were transported to the Cookeville police station in
separate cars. While waiting to be interviewed, Ms. Patzer kept saying that she
couldn't believe Harp had killed himself. During her statement, Ms. Patzer said
that they were having a good time. "Next thing I know he [Harp] pulled out a little
gun in front of the door and held it up to his head, laughed, and pulled the trigger."

After the interviews, Ms. Patzer and Petitioner were driven back to Petitioner's
trailer. At the station, the officers noticed a spot on Petitioner's tee shirt which
appeared to be blood. Petitioner said the spot was spaghetti sauce but agreed to
give them the shirt when he returned to the trailer. Officer Demming waited
outside the trailer for five minutes before the Petitioner gave her the shirt. She put
the shirt on the back seat of the squad car where Ms. Patzer had previously sat.

The Petitioner and Ms. Patzer spent the rest of Sunday at the trailer. Early Sunday
morning, Ms. Patzer called her husband, Keith Patzer, who was in jail at that time
awaiting trial, and told him about the suicide. She also learned that Officer
Demming was the prosecuting officer on Keith's case. Ms. Patzer then called
Officer Demming and asked her if Keith could be released for a few days to help
her through the second interview. The request was denied.

Sunday night, Ms. Patzer accompanied the Petitioner to the home of Mr. and Mrs.

6

Bennis, friends of the Petitioner, and spent the night. Ms. Patzer and the Petitioner continued to drink all through Sunday. On Monday, the pair traveled to Jackson County to purchase liquor, then picked up Ms. Patzer's employment check at Shoney's. After depositing the check, they returned to the Petitioner's trailer just as Detective Lane pulled up. He asked Ms. Patzer to accompany him to the station to go over her prior statement in order to resolve some questions he had. During the second interview, Ms. Patzer amended her prior statement and testified that Petitioner had killed Howard Harp. Ms. Patzer stated that she caught a glimpse of a gun in Petitioner's hand. She did not see him pull the trigger, but testified that Petitioner brought the gun to Howard's temple and shot. Ms. Patzer explained that she was intoxicated and the Petitioner was the one who suggested the idea that Howard had committed suicide, and she had simply wanted to believe it.

Prior to her amended statement on Monday, October 16, Ms. Patzer maintained that Howard Harp had committed suicide in numerous statements, both to the police officers assigned to the case as well as various friends and acquaintances. At trial, Petitioner's sole defense was based on the theory that Howard had shot himself . Defense counsel introduced medical records showing that Howard had attempted suicide several times since he was fifteen years old, and all of the attempts occurred while Howard was intoxicated. Jerry Harp, Howard's brother, testified that Howard told him on the morning of October 14, 1995, that he was going to kill himself, and that he was drinking at the time. Petitioner also maintained that Ms. Patzer's motive for changing her story was based on the belief that her husband was potentially facing significant jail time, and her cooperation might induce leniency.

At trial, several statements made by Ms. Patzer immediately following the shooting, as well as at the police station, in which she reiterated that Howard Harp had shot himself were admitted as substantive evidence as excited utterances. These statements included the 911 call Ms. Patzer made and the 911 call she received in response to her disconnected call. Defense counsel cross-examined Ms. Patzer at length on her statements. He then offered into evidence, as a prior inconsistent statement, her written statement to the police in which she stated that Howard Harp killed himself. The trial judge made a sua sponte instruction to the jury that the statement was to be considered for impeachment purposes only and not for the truth of the matters contained within the statement. Defense counsel did not object to the instruction and did not offer any basis for an exception to the hearsay rule.

Walker, 2002 WL 31520654 at **2-3.

## 2. Petitioner's Post-Conviction Appeal

7

In his post-conviction appeal, the Tennessee Court of Criminal Appeals made the

following findings on Petitioner's ineffective assistance claims:

> At the hearing, Petitioner alleged that the State made improper, misleading, false and prejudicial statements in the jury's presence concerning the gunshot residue tests and blood analyses performed on Petitioner and Mr. Harp. Because counsel did not object to the prosecution's examination of the State's expert witnesses or to closing arguments on these evidential issues, Petitioner claimed he was denied effective assistance of counsel. Petitioner also alleged that the State improperly vouched for the credibility of the State's witnesses when the prosecutor referred to the "nice police" and complimented James Lane on doing "an excellent job" investigating the case during closing arguments, and that counsel's failure to object to these statements had a prejudicial effect on Petitioner's trial.
>
> Petitioner next claimed counsel was deficient in his performance because he did not object to the State's closing arguments which improperly commented on his decision not to testify, and that such failure was prejudicial to Petitioner. Specifically, Petitioner testified that such statements as "Mr. Cameron [trial counsel] admitted it for him," referring to his counsel's explanation of why Petitioner had lied about owning the gun used in the shooting, impermissibly drew the jury's attention to the fact that Petitioner did not take the stand. Petitioner also alleged that the State's comment that "our victim hasn't has [sic] an opportunity to testify" accomplished the same impermissible result.
>
> Petitioner alleged that counsel failed to object to the State's introduction of the results of a blood residue analysis on Petitioner's tee-shirt, as well as the tee-shirt itself, on the grounds that the analysis did not show whose blood was on the shirt, or when or how the blood was obtained. Petitioner testified that such evidence was prejudicial because it erroneously compelled the jury to infer that the blood was that of Mr. Harp.
>
> At trial, the State presented evidence concerning the results of gunshot residue analyses performed on Petitioner, Ms. Patzer and Howard Harp. Agent Davis, a forensic scientist with the Tennessee Bureau of Investigation, testified that the tests performed on Petitioner and Ms. Patzer showed no elements indicative of gunshot residue, while Howard Harp's test was inconclusive as to gunshot residue. Petitioner alleged that his counsel should have investigated and secured an expert witness to explain why there was not more gunshot residue found on Mr. Harp since Petitioner alleged that Mr. Harp had committed suicide. Petitioner testified that he provided the name of a potential expert to his counsel before the trial but counsel did not call the witness to testify.

8

The State's serologist testified at trial that the spot of blood on the Petitioner's tee-shirt was human blood, but too small to type. At his post-conviction hearing, Petitioner testified that counsel should have provided the defense's own serologist to explain the difference between blood splatter and blood spots. Petitioner claimed that the fact that he did not have blood splatter on his clothes supported his defense that he was not in close proximity to the victim when the shot occurred.

* * *

Petitioner claimed that counsel was deficient in failing to interview Ms. Patzer, the State's only eye witness, prior to trial. Petitioner further alleged that he believed the State had purposively secluded Ms. Patzer so that the defense would not have an opportunity to talk with her, and that Ms. Patzer received benefits from the State in exchange for her testimony. He blamed counsel for not discovering evidence to support these charges, and that his performance was, therefore, ineffective in this regard. Petitioner also claimed that counsel was deficient in not objecting to Ms. Patzer's testimony that she had not received any benefit other than reimbursement for travel expenses. Finally, Petitioner alleged that counsel inadequately investigated Ms. Patzer's background for purposes of impeaching her credibility as a witness and casting doubt on her truthfulness.

* * *

Petitioner alleged that counsel improperly failed to object to the trial judge's sua sponte limiting instruction as well as the jury instructions pertaining to the admissibility of prior inconsistent statements. Although Petitioner failed to preserve the issues concerning improper instructions for appeal, this Court did address these claims. State v. Lon S. Walker, No. 01C01-9711-CR-00535, 1999 WL 219629 (Tenn.Crim.App. at Nashville, 1999).

At trial, Counsel introduced Ms. Patzer's written police statement as a prior inconsistent statement. The trial judge issued a sua sponte instruction to the jury stating that the statement could be considered for impeachment purposes only. At his post-conviction hearing, Petitioner alleged that the instruction was improper because, absent an objection as to the hearsay nature of the statement, the evidence should have been admissible as substantive evidence, and counsel failed to object to the instruction to the prejudice of Petitioner.

This Court concluded that Petitioner's issue concerning the trial judge's sua sponte instruction was without merit because the written police statement was actually extrinsic evidence of a prior inconsistent statement not denied by the witness. Tenn. R. Evid. 613. Accordingly, this Court concluded that while the statement

9

should not have been admitted into evidence, the admission was harmless error. Walker, No. 01C01-9711-CR-00535, 1999 WL 219629, at 6. At his post-conviction hearing, Petitioner suggested in his testimony that the written police statement may have qualified as an excited utterance under Tenn. Rule 803, and therefore admissible as substantiative evidence.

Petitioner also argued that the trial judge erred in his instructions to the jury concerning the admissibility of out of court statements, and that counsel was deficient for failing to object to such instructions. The instructions addressed only the jury's consideration of a witness's out of court statement for impeachment purposes only, although some of the out of court statements were admitted as substantive evidence. In the direct appeal of Petitioner's conviction, this court concluded that the fact that the instructions could have been more detailed did not render the instruction improper, and, absent a special request for an additional charge, the trial court would not be held in error on this basis. Walker, No. 01C01-9711-CR-00535, 1999 WL 219629, at 6.

Petitioner claimed that counsel was deficient for failing to introduce proof in the form of live testimony rather than through affidavits at the hearing on Petitioner's motion for a new trial which contained allegations that the prosecutor improperly remarked that the testimony of one of Petitioner's witnesses was rehearsed. Petitioner's appellate counsel testified that the failure to introduce proof on this issue resulted in appellate counsel's inability to raise the issue on appeal. Petitioner also alleges that counsel was deficient in not objecting to the accuracy of the transcript on the grounds that the record omitted this remark. Finally, Petitioner claimed that counsel failed to object to the inaccuracy of the trial transcript because the transcript contained material omissions.

Trial counsel testified that he did not believe that the testimony by the State's expert witnesses regarding the blood spot found on Petitioner's tee-shirt, as well as the lack of gun residue on Petitioner's hands, harmed Petitioner's defense. On the contrary, trial counsel testified, the lack of any significant amount of blood on Petitioner's clothing supported the defense's theory that Petitioner was not in the vicinity of Mr. Harp when the shooting occurred. Although a gun shot residue expert was identified, counsel testified that Petitioner decided not to call the witness because of the expense involved and the doubtful value of the testimony. Counsel also testified that Petitioner had never requested a serologist. As far as securing an expert witness to testify as to the deceased's state of mind, counsel testified that he felt that this type of testimony, if he could find an expert in this field, would probably not be admissible in court.

\* \* \*

10

Testimony established that there was minimal gunshot residue on Mr. Harp, and what residue that was found was limited to Mr. Harp's palms. Although Petitioner's gunshot residue analysis was returned negative, the State's expert witness also testified that very minimal particles of antimony and barium were found on Petitioner's hands. This residue, however, was so minimal that its presence did not alter the test's conclusions, nor could the expert say where the Petitioner had acquired such elements. When asked why a person might not have gunshot residue on their hands, the expert witness testified that washing one's hands could eliminate any residue.

The testimony also showed that Petitioner was alone in the trailer after the shooting for a period of approximately two minutes between the time Ms. Patzer locked herself in the bathroom and the police arrived. Fresh water puddles were found around the sink. No fingerprints were found on the gun, and Howard Harp was lying on the floor, mortally wounded. From this evidence, the State argued that Petitioner might have washed his hands at the sink and wiped off the fingerprints.

Finally, Petitioner argued at trial that Mr. Harp shot himself, but the tests performed on Mr. Harp showed that gunshot residue was present only on his palms. Accordingly, the State argued that Mr. Harp did not pull the trigger, but rather had thrown up his hands to ward off the shot.

The post-conviction court concluded, after a review of the record, that the State's proposed inferences were reasonably drawn from the evidence presented at trial, and Petitioner did not present clear and convincing evidence at the post-conviction hearing to support his claim that such inferences were improper, or that the inferences, when taken together, either shifted or diluted the State's burden of proof. The post-conviction court found that even if some of the inferences or questions to witnesses strayed beyond the permissible limit, Petitioner did not show that his defense was prejudiced, or that the trial results would have been any different, absent the objectionable arguments.

Walker, 2002 WL 31520654 at **5-8, 11. Other factual findings of the Tennessee appellate and

trial courts are presented in the context of a particular claim.

## B. Conclusions of Law

Petitioner's claims are governed by the provisions of the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the

11

AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. <u>Id.</u> The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. <u>Id.</u> at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." <u>Id.</u> at 390; <u>accord</u> <u>Joshua v. DeWitt</u>, 341 F.3d 430, 436 (6th Cir. 2003).

In <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the

12

state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. Later, the Supreme Court reiterated that:

> In this and related contexts <u>we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.</u> See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

## 1. Sufficiency of the Evidence

For this claim, Petitioner cites principally the substantial inconsistencies between Stacy Patzer's trial testimony and her earlier oral and written statements to various law enforcement officials and other persons shortly after the murder that the victim committed suicide. Petitioner contends that Patzer's testimony is the key to his conviction. In his direct appeal, the Tennessee Court of Criminal Appeals ruled on this claim as follows:

> [T]he case before us only involves the contradictions between Stacy Patzer's trial testimony and her statements made immediately following the shooting incident. Stacy **Patzer explained that her statements that the victim committed suicide made immediately following the incident were the result of her intoxicated**

13

**and hysterical state and were influenced by the appellant's suggestion that
the victim had shot himself. Regardless of this explanation, Ms. Patzer's trial
testimony was corroborated by evidence that (1) the weapon involved
belonged to the appellant, despite his denial of ownership; (2) the presence of
human blood on the appellant's t-shirt, despite his explanation that the stains
were spaghetti sauce; (3) the appellant's denial that he was not in the room
when the shooting occurred; (4) the testimony of three witnesses who
described the appellant's anger with the victim; (5) the appellant's attempt to
prohibit Stacy Patzer from contacting "911" after the incident.** These
circumstances of independent and corroborating proof distinguish the present case
from the facts before the court in <u>Letner</u>. [relied on by Petitioner].

*   *   *

Viewing the evidence in the light most favorable to the State, we conclude that
there was sufficient evidence for the jury to find the appellant guilty of second
degree murder. Tenn. R. App. P. 13(e). This issue is without merit.

<u>State v. Walker</u>, 1999 WL 219629 at ** 3, 4 (emphasis added).

For a Fourteenth Amendment claim based upon insufficient evidence, <u>Jackson v.

Virginia</u>, 443 U.S. 307 (1979) sets the standards for habeas review:

...[T]he critical inquiry on review of the sufficiency of the evidence to support a
criminal conviction must be not simply to determine whether the jury was
properly instructed, but to determine whether the record evidence could
reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry
does not require a court to `ask itself whether <u>it</u> believes that the evidence at the
trial established guilt beyond a reasonable doubt.' Instead, **the relevant question
is whether, after viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt.** This familiar standard gives full play
to the responsibility of the trier of fact fairly to resolve conflicts in the testimony,
to weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts. **Once a defendant has been found guilty of the crime charged,
the factfinder's role as weigher of the evidence is preserved through a legal
conclusion that upon judicial review all of the evidence is to be considered in
the light most favorable to the prosecution.** The criterion thus impinges upon
`jury' discretion only to the extent necessary to guarantee the fundamental
protection of due process of law.

<u>Id.</u> at 318-19 (emphasis added with footnotes and citations omitted).

14

A presumption of correctness obtains in determining whether sufficient evidence exist to support a conviction. 28 U.S.C. § 2254(e). If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. 443 U.S. at 324. The rule concerning reasonable inferences applies with equal force to historical facts. Parke v. Raley, 506 U.S. 20 (1992) (involving the challenge to a prior conviction that resulted in enhancement of a sentence). Yet, reliance on legislative presumptions to prove facts is insufficient. Hicks v. Feiock, 485 U.S. 624, 637-40 (1988).

Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirements of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam), and such evidence need not remove every reasonable hypothesis except that of guilt. United States v. Vannerson, 786 F.2d 221, 225 (6th Cir. 1986). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985). This due process guarantee of sufficiency of the evidence extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense, unless the state has made the absence of a defense an element of the crime. Allen v. Redman, 858 F.2d 1194, 1196-98 (6th Cir. 1988).

Hearsay evidence can support a state conviction, provided that the hearsay qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n.8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993). The unavailability of the declarant is unnecessary if the hearsay statements were made in a prior court proceeding. United States v. Inadi, 475 U.S. 387, 394 (1986).

Here, the Tennessee appellate court identified circumstantial evidence, aside from Patzer's statements, that support a finding of guilt of second degree murder for which the State had to prove "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210. The Tennessee Appellate Court cited:

> (1) the weapon involved belonged to the appellant, despite his denial of ownership; (2) the presence of human blood on the appellant's t-shirt, despite his explanation that the stains were spaghetti sauce; (3) the appellant's denial that he was not in the room when the shooting occurred; (4) the testimony of three witnesses who described the appellant's anger with the victim; (5) the appellant's attempt to prohibit Stacy Patzer from contacting "911" after the incident.

Walker, 1999 WL 219629 at *3. In addition, the victim had minimal gun residue that was only on his palms. Walker, 2002 WL 31520654 at *11.

Moreover, Patzer's cited inconsistent oral statements were made when she was "very intoxicated" after extensive drinking shortly before the murder. Id. at *2. In addition, Petitioner suggested to Patzer that the victim committed suicide and told Patzer not call the police. Id. The jury was aware of Patzer's inconsistent written statements, and the trial court admitted as substantive evidence Patzer's oral statements in her 911 call and her statements to Officer Lane en route to the police station, and her oral statements to lane at the police station. (Docket Entry No. 6, Addendum 1, Volume 4, Transcript at pp. 326-27, 431 and 465). See also Walker, 1999 WL 219629 at *6. The jury evaluated Patzer's inconsistencies and substantive evidence with the State's other proof, including Petitioner's several statements about the gun near the victim and the stains on his t-shirt that were false. Credibility findings are for the state courts. Skaggs, 235 F.3d at 266. As the Tennessee appellate court observed, the jury also had "voluminous records to illustrate Howard Harp's history of psychological problems and suicide tendencies. Indeed, his

brother Jerry conceded on cross examination that on the morning of the shooting, Howard had stated he was going to kill himself. Jerry also conceded that almost every time his brother consumed alcohol he would become depressed and talked about killing himself." Walker, 1999 WL 219624 at *3. In these circumstances, considering the evidence in a light most favorable to the State and the jury's verdict, the State appellate court's ruling on this claim is not unreasonable under the Jackson standards.

## 2. The Trial Court's Evidentiary Ruling and Instructions

This claim is two-fold and concerns the trial court's evidentiary ruling that Patzer's inconsistent written statement was to be considered only for impeachment purposes and the Court's instruction to the jury and the trial court's instructions on Patzer's prior inconsistent statements. The factual context for these rulings were based upon facts after the murder:

> Ms. Patzer began screaming. She picked up the phone in front of her and dialed 911. Before the call was answered, Petitioner pressed the disconnect button on the receiver and said they would handle the situation themselves. Ms. Patzer ran screaming to the bathroom and locked herself in. Pursuant to normal procedure when an emergency call is received, the 911 operator called back, and Ms. Patzer answered the call on the bathroom telephone. She told the operator that Howard Harp had just committed suicide.

> Police were dispatched to the scene and arrived in approximately two minutes. Ms. Patzer was still in the bathroom and the Petitioner was outside. At the scene, officers found a .38 caliber handgun in the kitchen sink beneath a Coca-Cola cup. The gun had one spent round and five live rounds. The counter by the sink was wet. The Petitioner denied knowing where the gun came from, and said he was down the hall when the shot occurred. Ms. Patzer repeated several times that Howard had shot himself.

> Ms. Patzer and Petitioner were transported to the Cookeville police station in separate cars. While waiting to be interviewed, Ms. Patzer kept saying that she couldn't believe Harp had killed himself. During her statement, Ms. Patzer said that they were having a good time. "Next thing I know he [Harp] pulled out a little gun in front of the door and held it up to his head, laughed, and pulled the trigger."

17

After the interviews, Ms. Patzer and Petitioner were driven back to Petitioner's trailer. At the station, the officers noticed a spot on Petitioner's tee shirt which appeared to be blood. Petitioner said the spot was spaghetti sauce but agreed to give them the shirt when he returned to the trailer. Officer Demming waited outside the trailer for five minutes before the Petitioner gave her the shirt. She put the shirt on the back seat of the squad car where Ms. Patzer had previously sat.

The Petitioner and Ms. Patzer spent the rest of Sunday at the trailer. Early Sunday morning, Ms. Patzer called her husband, Keith Patzer, who was in jail at that time awaiting trial, and told him about the suicide. She also learned that Officer Demming was the prosecuting officer on Keith's case. Ms. Patzer then called Officer Demming and asked her if Keith could be released for a few days to help her through the second interview. The request was denied.

Sunday night, Ms. Patzer accompanied the Petitioner to the home of Mr. and Mrs. Bennis, friends of the Petitioner, and spent the night. Ms. Patzer and the Petitioner continued to drink all through Sunday. On Monday, the pair traveled to Jackson County to purchase liquor, then picked up Ms. Patzer's employment check at Shoney's. After depositing the check, they returned to the Petitioner's trailer just as Detective Lane pulled up. He asked Ms. Patzer to accompany him to the station to go over her prior statement in order to resolve some questions he had. During the second interview, Ms. Patzer amended her prior statement and testified that Petitioner had killed Howard Harp. Ms. Patzer stated that she caught a glimpse of a gun in Petitioner's hand. She did not see him pull the trigger, but testified that Petitioner brought the gun to Howard's temple and shot. Ms. Patzer explained that she was intoxicated and the Petitioner was the one who suggested the idea that Howard had committed suicide, and she had simply wanted to believe it.

Prior to her amended statement on Monday, October 16, Ms. Patzer maintained that Howard Harp had committed suicide in numerous statements, both to the police officers assigned to the case as well as various friends and acquaintances. At trial, Petitioner's sole defense was based on the theory that Howard had shot himself . Defense counsel introduced medical records showing that Howard had attempted suicide several times since he was fifteen years old, and all of the attempts occurred while Howard was intoxicated. Jerry Harp, Howard's brother, testified that Howard told him on the morning of October 14, 1995, that he was going to kill himself, and that he was drinking at the time. Petitioner also maintained that Ms. Patzer's motive for changing her story was based on the belief that her husband was potentially facing significant jail time, and her cooperation might induce leniency.

**At trial, several statements made by Ms. Patzer immediately following the shooting, as well as at the police station, in which she reiterated that Howard**

18

**Harp had shot himself were admitted as substantive evidence as excited
utterances. These statements included the 911 call Ms. Patzer made and the
911 call she received in response to her disconnected call. Defense counsel
cross-examined Ms. Patzer at length on her statements. He then offered into
evidence, as a prior inconsistent statement, her written statement to the
police in which she stated that Howard Harp killed himself. The trial judge
made a sua sponte instruction to the jury that the statement was to be
considered for impeachment purposes only and not for the truth of the
matters contained within the statement. Defense counsel did not object to the
instruction and did not offer any basis for an exception to the hearsay rule.**

Walker, 2002 WL 31520654 at **2-3 (emphasis added).

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals held that the trial

court's jury evidentiary ruling admitting Patzer's inconsistent written statement was harmless

error.[2]

> Initially, we note that the appellant waived his right to raise this issue on appeal
> because he failed to object to the instruction at trial. See Tenn. R.App. P. 36(a).
> Notwithstanding waiver, we find the appellant's arguments without merit.
> Tennessee law has traditionally permitted a witness's prior inconsistent statement
> to be used to impeach the witness. Neil P. Cohen et al., Tennessee Law of
> Evidence § 613.4 (1995 and 1998 Supp.); see also Tenn. R. Evid. 613. [P]rior
> inconsistent statements of a witness are only to be considered on the issue of
> credibility and are not generally admissible as substantive evidence as such
> statements constitute hearsay. See State v. Reece, 637 S.W.2d 858, 861
> (Tenn.1982). A prior inconsistent statement introduced for purposes of
> impeachment may be considered by the jury as substantive evidence only if the
> statement is admissible under a hearsay exception or other rule of evidence. Id.
> **In the present case, the appellant does not dispute that Ms. Patzer's written
> statement constitutes hearsay. Furthermore, at trial, the appellant did not
> offer a hearsay exception for admissibility of the statement and conceded
> that the only purpose of introducing the statement was to attack Ms. Patzer's
> credibility. Accordingly, the statement could only be received as impeaching
> evidence.** Our supreme court has directed that, when prior statements are only to
> be considered on the issue of credibility, "the trial judge should give a
> contemporaneous instruction to this effect when the impeaching statements are

---

[2]The trial court permitted the introduction of Patzer's prior oral inconsistent statements as
admissible hearsay under the excited utterance exception, including Patzer's statements recorded
on the "911 tape." Walker, 1999 WL 219629 at *6.

19

offered." See Reece, 637 S.W.2d at 861; see also Comments, T.P.I.-Crim. 42.06 (4th ed.1995). Accordingly, the trial court properly, sua sponte, instructed the jury as to the applicable law. See, e.g., State v. Combs, 945 S.W.2d 770, 774 (Tenn.Crim.App.1996), perm. to appeal denied, (Tenn.1997) ( sua sponte action limiting irrelevant evidence upheld).

Notwithstanding the trial court's proper instruction and the failure of either party to raise such issue on appeal, **we note that the trial court should not have admitted the statement into evidence as the written statement was extrinsic evidence of the prior inconsistent statement. If a witness admits making the prior inconsistent statement, the written statement is not admissible since it would be cumulative evidence and waste time.** See Tenn. R. Evid. 613(b); see also State v. Martin, 964 S.W.2d 564, 567 (Tenn.1998); Neil P. Cohen et al., Tennessee Law of Evidence § 613.4. Although this admission was error, a violation of an evidentiary rule does not mandate reversal if the error "was more probably than not harmless." See Martin, 964 S.W.2d at 568 (citing United States v. Barrett, 703 F.2d 1076, 1081-82 (9th Cir. 1983). See also Wilson v. State, 724 S.W.2d 766, 769 (Tenn. Crim. App. 1986) (parenthetical omitted)). **We cannot conclude that the admission of extrinsic evidence of the witness's prior inconsistent statement, which she admitted on both direct and cross-examination, "affirmatively appear [s] to have affected the result of the trial on its merits."** See Tenn. R. Crim. P. 52(a).

Walker, 1999 WL 219629 at *5 (citing, inter alia, United States v. Barrett, 703 F.2d 1076,

1081-82 (9th Cir. 1983) with other citations omitted and emphasis added).

An issue concerning admissibility of evidence under state law rarely serves as a basis for

habeas corpus relief, Estelle v. McGuire, 502 U.S. 62 (1991), unless it can be viewed as so

egregious that petitioner was denied a fundamentally fair trial. Cooper v. Sowders, 837 F.2d 284,

286 (6th Cir. 1988). "Today, we reemphasize that it is not the province of a federal habeas court

to reexamine state court determinations on state law questions." Estelle, 502 U.S. at 67-68. Yet,

to warrant habeas relief, any excluded evidence must "tend to exculpate" the petitioner and also

must contain "persuasive assurances of trustworthiness." Turpin v. Kassulke, 26 F.3d 1392,

1396 (6th Cir. 1994). Evidentiary rulings by a state's highest court under state law are binding on

the federal courts. <u>Wainwright v. Goode</u>, 464 U.S. 78, 84 (1983) (per curiam) and federal courts are bound by intermediate state appellate court decisions unless convinced that the highest state court would decide the issue differently. <u>Olsen</u>, 843 F.2d at 929.

In the Court's view, this claim about the admissibility of Patzer's prior inconsistent written statement presents a state law evidentiary issue that was erroneous, but inured to Petitioner's benefit. The trial court admitted Patzer's prior oral inconsistent statements correctly under state law, and that is consistent with federal law.[3] In any event, Patzer's prior oral statements were made when she was "very intoxicated" after her extended drinking and at Petitioner's suggestion that the victim committed suicide. The trial court still admitted those statements as excited utterances. Given Patzer's intoxicated state, the jury could reasonably conclude that Patzer's prior statements after the murder lack "persuasive assurances of trustworthiness." <u>Turpin</u>, 26 F.3d at 1396. Thus, Petitioner's trial was not fundamentally unfair. The Court concludes that state court's rulings are not shown to be unreasonable under <u>Estelle</u>.

As to the trial court's instructions to the jury, the state trial court's actual instructions were during Petitioner's trial counsel's cross-examination of Patzer about her statements to police after the shooting. The trial court inquired of defense counsel, "I suppose the statement is being introduced to show the inconsistencies, Mr. Cameron?" to which Petitioner's counsel responded: "Yes, sir." (Docket Entry No. 6, Addendum 1, Volume 3 at p. 194). The Court then told the jury:

---

[3]The excited utterance exception to the hearsay rule is deemed reliable because a statement made while the declarant was under the stress of excitement, is unlikely to be "contrived or the product of reflection." <u>Haggins v. Warden, Fort Pillow State Farm</u>, 715 F.2d 1050, 1057 (6th Cir. 1983).

21

And so the jury I think should be advised that inconsistent statements may be shown and relate to the credibility of the witness and you may consider any inconsistent statement that has been previously made that is inconsistent with what she's testifying to now as it relates to her credibility. But I think the statement may not be - - - the statement may not be received by you as evidence in the case for the truth of the matter asserted. If there's any inconsistencies, you may consider that in evaluating her credibility. In other words, that statement is not evidence. That statement only is evidence for inconsistencies, not the substance of the statement.

Id. Petitioner's counsel did not object to the court's instruction. Id. In his final instruction, the trial court instructed the jury to consider all of the evidence. Id. at Volume 6, p. 658.

The Tennessee appellate court found that Petitioner waived any objection to this instruction, but nonetheless ruled that while the trial court's instruction could have been more detailed, it conformed to Tennessee law.

Initially, we note that the appellant waived his right to raise this issue on appeal because he failed to object to the instruction at trial. See Tenn. R.App. P. 36(a).

\* \* \*

Additionally, the appellant, in his final argument, asserts that the trial court, in its final charge to the jury, "improperly limited the jury's consideration of a witness's out of court statement" for purposes of determining the witness's credibility. The trial court permitted the State to introduce prior inconsistent statements of Ms. Patzer as admissible hearsay under the excited utterance exception, e.g., Ms. Patzer's statements recorded on the "911 tape." The appellant, thus, argues that the instruction provided by the trial court had a limiting impact upon the jury's consideration of admissible prior inconsistent statements and other related hearsay exception evidence.

**Again, the State responds, in part, that the appellant has waived this issue by failing to enter a contemporaneous objection at trial. Pursuant to Rule 30, Tenn. R.Crim. P., a defendant is permitted to challenge the content of an instruction or the denial of a requested instruction as error in support of a motion for new trial despite the failure to object at trial.** Our supreme court has interpreted this rule as allowing claims of the denial of a requested instruction or of a positive error in the jury instructions but not of errors of omissions when no objection or special request was made at trial. State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996); Reece, 637 S.W.2d at 861. See also State v. Brewer, 932

22

S.W.2d 1, 16 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1996) (holding that as a general rule, "in the absence of an objection or a special request, a defendant may not later raise an issue regarding an omission in the court's charge"). **In the present case, the appellant contests the trial court's omission of language permitting the jury to consider "excited utterance" statements as substantive eviden**ce. **Thus, the issue is waived.**

**Notwithstanding waiver, the instruction provided by the trial court in the present case is almost verbatim T.P.I.Crim. 42.06 (4th ed. 1995). The Comments to this instruction provide that "[t]his instruction must be given in each case, unless T.P. I.Crim. 42.04(b) has been charged." Instruction 42.04 was not provided. Additionally, the fact that an instruction could have been more detailed does not render the instruction as given improper, and absent a special request for an additional charge, a trial court will not be held in error. State v. Haynes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986). This issue is without merit.**

Id. at **5, 6 (emphasis added).

As to jury instructions, to warrant habeas relief for incorrect jury instructions, a petitioner must show more than that "the instruction is undesirable, erroneous or universally condemned. Henderson v. Kibbe, 431 U.S. 145, 154 (1977). "The question in such a collateral proceeding is whether the ailing instruction by itself infected the entire trial that the resulting conviction violates due process." Id. (quoting Cupp v. Naughten, 417 U.S. 141, 147 (1973)). "It is a rare case in which an improper instruction will justify reversal of a conviction when no objection has been made in the trial court." Id. Accord Estelle, 502 U.S. at 72, 73 ("[w]e also bear in mind our previous admonition that we `have defined the category of infractions that violate "fundamental fairness" very narrowly.'" (quoting Dowling v. United States, 493 U.S. 342, 352 (1990). As an example of jury instructions offending this constitutional limitation, in Sandstrom v. Montana, 442 U.S. 510, 524 (1979), the Supreme Court ruled unconstitutional a jury instruction that presumes a person intends to commit the natural, ordinary and usual consequences of his

23

voluntary actions.

The jury instruction that Patzer's prior written and oral inconsistent statements could be considered for impeachment only, was a correct statement of Tennessee law, consistent with federal law, as reflected in the Tennessee appellate court's ruling. Upon consideration of the entire record, the extensive other proof, including the victim's suicidal tendencies, the Petitioner's statements on the day of the murder and the jury instruction that the jury consider all of the evidence, the Court concludes that Petitioner trial was not rendered fundamentally unfair by this instruction. Thus, the Tennessee courts' ruling on this jury instruction is not unreasonable.

### 3. Ineffective Assistance of Trial Counsel

In his post-conviction appeal, the Tennessee appellate court summarized Petitioner's ineffective assistance of counsel claims that as pertinent here are:

> To summarize, Petitioner alleges that he was denied effective assistance of counsel due to counsel's failure (1) to object to certain remarks, questions or inferences made by the State during the examination of witnesses or in closing arguments; (2) to investigate or prepare witnesses properly, or call expert witnesses to challenge the prosecution's evidence; (3) to adequately prepare for trial, develop an alternative defense, or advise Petitioner adequately about trial decisions, including Petitioner's decision on testifying; (4) to adequately prepare Petitioner's motion for a new trial; and (5) to object to the correctness of the trial transcript. After a review of the record, we conclude that Petitioner is not entitled to relief.

Walker, 2002 WL 31520654 at **10. This quotation is based upon Petitioner's trial brief that interspersed his ineffective assistance of counsel claims with his prosecutorial misconduct claims. See Docket Entry No. 6, Addendum 4, Document 1, Appellant's Brief at pp. 30-31 and 36-37, 40-41.

In his State appellate brief, Petitioner intermingled his contentions about the prosecutors'

misconduct for which Petitioner his counsel was unresponsive and ineffective:

> In the case presently before the Court, Lon Walker asserts and presented evidence of improper arguments made by the assistant District Attorney in this matter. Specifically, testimony was presented at the hearing by John Bennis who was a witness called by Lon Walker, that prior to his testimony at trial that **General Benjamin Fann stated "this has been rehearsed that he was a friend of Lon Walker's and we had it all planned out as to what I was going to testify to"** (See Hearing Transcript Page 99 Line 15-20). Furthermore, Mr. Bennis testified that the jury was in the courtroom at that time and were able to hear what was being said by Mr. Fann. (See Hearing Transcript Page 99 Line 21 through Page 100 Line 7). Lon Walter further asserts and avers that the assistant District attorney Ben **Fann committed prosecutorial misconduct in that he intentionally, knowingly and recklessly made false and misleading arguments to the jury in regard to blood splatter evidence and gun shot residue evidence such that those statements transcend the bounds of proper argument.** Lon Walter asserts that the transcript of the trial is incomplete and inaccurate as it fails to reflect the dialogue between Mr. Mrs. Bennis and the District Attorney, the dialogue of the District Attorney during the testimony of Dr. Charles Harlan, the limiting instructions by the Court regarding out of Court statements. (Hearing transcript page 27 line 4 through page 28 line 24.) Lon Walker testified that the district attorney made false representations, which micharacterized the evidence and thus arises to the level of improper prosecutorial conduct. Specifically, Lon **Walker asserts that the District attorney mischarachterize the blood sample as blood splatter when in fact in was a mere spot.**

> One again during the testimony of Willie Bennis, it was testified that the Assistant District Attorney again made an outburst in front of the jury prior to the testimony regarding the credibility of that witness. Specifically, Ms. **Bennis testified that as she started to testify, Mr. Fann said that it had been rehearsed.** (See Hearing Transcript Page 107 Line 19-22). Ms. Bennis further testified that the implication of the District Attorney was that she was lying in her testimony. (See Hearing Transcript Page 108 Line 3-5). Finally, Ms. Bennis testified that all of this transpired within the hearing of the jury. (See Hearing Transcript Page 108 Line 8-12). When viewing these statements by the prosecutor in contrast to the requirements in the Judge case supra. It is plain to see that the context in which these statements were made and circumstances were such that the witnesses of the Defendant were discredited and thus, less likely to be believed by the jury. Furthermore, no curative measures were undertaken by the trial court to correct these actions. Clearly, the intent of the state in making these remarks were to discredit the defense witnesses and thus, circumvent the defense efforts. When

25

you consider the fourth prong under the <u>Judge</u> test, the cumulative affect of these errors were to present the jury a pattern of conduct by the prosecutor in which witnesses of the Defendant would be discredited and undermined such that they should not be believed by the jury. **In light of trial counsels failure to object to these statements and furthermore when reviewing the entirely of trial counsels deficiency in performance, the conduct of the state arises to the level of prosecutorial misconduct and renders the trial fundamentally unfair, thus entitling Lon Walker to a new trial.**

(Docket Entry No. 6, Addendum 4, Document 1, Appellant's Brief at pp. 40-41).

To evaluate these claims, the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims. In <u>Mitchell v. Mason,</u> 325 F.3d 732 (6th Cir. 2003), the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

> In <u>United States v. Cronic,</u> 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

> . . . the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." <u>Cronic,</u> 466 U.S. at 659 n. 25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. . . . In <u>Williams,</u> the Supreme Court confirmed the vitality of this "per se" approach, noting that while the <u>Strickland v. Washington,</u> 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." <u>Williams,</u> 529 U.S. at 391 . . . (citing <u>Strickland,</u> 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. <u>Olden,</u> 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of

26

trial).

*   *   *

> Within the first category are three types of presumptive ineffectiveness of counsel:
> The first is the complete denial of counsel, in which "the accused is denied the
> presence of counsel at 'a critical stage.'" <u>Bell</u>, 122 S.Ct. at 1851 (quoting <u>Cronic</u>,
> 466 U.S. at 659, 104 S.Ct. 2039).  The second is when counsel "'entirely fails to
> subject the prosecutions' case to meaningful adversarial testing.'" <u>Id.</u> (quoting
> <u>Cronic</u>, 466 U.S. at 659, 104 S.Ct. 2039).  The third is when counsel is placed in
> circumstances in which competent counsel very likely could not render assistance.

<u>Id.</u> at 740, 742.

In any event, <u>Strickland</u> directs that "[j]udicial scrutiny of counsel's performance must be

highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate

must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

of deference to counsel's judgments." 466 U.S. at 689, 691.  <u>Strickland</u> explained its reference to

the American Bar Association standards as:

> guides to determining what is reasonable, but they are only guides.  No particular
> set of detailed rules for counsel's conduct satisfactorily take into account of the
> variety of circumstances faced by defense counsel or the range of legitimate
> decisions regarding how best to represent a criminal defendant.   Any such set of
> rules would interfere with the constitutionally protected independence of counsel
> and restrict the wide  latitude counsel must have in making tactical decisions . . . .
> Indeed the existence of detailed guidelines for representation could distract
> counsel from the overriding mission of rigorous advocacy of the defendant's
> cause.  Moreover, the purpose of the effective assistance guarantee of the Sixth
> Amendment is not to impose the quality of legal representation, although that is a
> goal of considerable importance.  The purpose is simply to ensure that criminal
> defendants receive a fair trial.

<u>Id.</u> at 688-89.

As the Supreme Court noted,  "[c]ounsel's actions are usually based, quite properly, on

informed strategic choices made by the defendant and on information supplied by the defendant.

27

In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Yet, defense counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). See also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.")

Most of Petitioner's state ineffective assistance of counsel claims were in the context of a prosecutor's improper remarks and closing arguments. For such conduct to violate the defendant's right under the Fifth and Fourteenth Amendments' Due Process Clause:

> The misconduct must be so fundamentally unfair as to deny him due process, based on the totality of the circumstances of the case, taking into account the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilty of the accused.

Kincade v. Sparkman, 175 F.3d 444, 446 (6th Cir. 1999).

### a. Fann's Remarks During Defense Witness Examinations

This claim has two parts: the prosecutor's alleged "rehearsed" remark during the testimony of Willie Bennis and the prosecutor's alleged statements about Dr. Harlan's testimony on the path of the bullet. The state record reflects that John William Bennis actually testified that Fann, the prosecutor made this remark while John Bennie was on the witness stand:

Q.      [You were] in the witness box there?

A.      Yes, sir, setting right here.

28

*   *   *

Q.      What was examining you when you heard me say that?

A.      Nobody right at the time because **I had just took the witness stand and been sworn in and just sat down when it was made, sir.**

*   *   *

Q.      **And that's when I said "rehearsed"?**

A.      **Yes, sir.**

Id. at 99, 100 and 103 (emphasis added). Yet, in his earlier affidavit filed the state court shortly after trial, John Bennis stated: "while attorney, William A. Cameron was examining my wife, Willie Bennis. He was asking questions to Willie Bennis at the time and Mr. Fann made a statement that I could hear and could be heard by anyone in the Courtroom, he stated "rehearsed". I thought that was inappropriate and should not have been done." (Docket Entry No.6, Addendum 3, Volume 3 at Exhibit 2) (emphasis added). Willie Bennis filed a similar affidavit about Fann's remark in connection with Petitioner's motion for a new trial. Id.

Petitioner asserts that at trial, Fann's "rehearsed" remark caused Willie Bennis to testify that she was not a "liar." (Docket Entry No.6, Addendum 1, Volume 5 at p. 546). Yet, the trial transcript reveals that the direct examination of Willie Bennis was unremarkable and the reference to Bennis's statement that she was not a liar was a response to Fann's prior objections that defense counsel had been leading her on his direct examination. Bennis stated: "I said you're not leading me. That's what she said, and I'm not a liar." Id. Bennis's other response that she was not a liar was in response to a question at the end of her cross-examination about whether she was testifying under oath. Id. at 554-55. Petitioner's counsel did not hear the purported remark about Bennis.

29

Id. at p. 159. Fann denied that he made such a remark, but said that if he did, he would not have made the rehearsed remark about Willie Bennis's testimony. (Docket Entry No. 75-1, Fann Deposition at 5-7, 13-14).

According to Petitioner, Fann's other remark was during the testimony of Dr. Harlan, about the bullet path when Fann allegedly blurted out "the path of the bullet's got nothing to do with it. "We don't know how he done it. All we know is he done it." (Docket Entry No.6, Addendum 3, Volume 2, Post-Conviction Transcript at p. 28). Only Petitioner testified that such a statement was made. Petitioner contends that the prosecutor' remarks improperly asserted his personal belief of on the credibility of defense witnesses and his personal opinion and knowledge of Petitioner's guilt. Fann denies that he would have said "He done it." Id. at 14.

After the post-conviction hearing, the trial court made an express finding only on Fann's cited remark during Bennis's examination.

> Ground 17, Mr. Cameron failed to introduce proof at the hearing relative to the motion for a new trial on the issue of one of the trial prosecutor's Mr. Fann, making comment in the presence of the jury that Ms. Willie Bennis' testimony was rehearsed which resulted in the issue of being waived on the Petitioner's direct appeal and Mr. Fann conveying to the jury his personal belief regarding the credibility of the Petitioner's proof. **It seems that no one heard that statement other than the Bennises.** It is not in the record. **Mr. Cameron says he didn't hear it. I cannot find that he was deficient in failing to object to it. There is some reasonable likelihood that the Bennis' testimony is not entirely accurate.** If in fact Mr. Bennis heard the statement when Mrs. Bennis was on the witness stand, some several feet between the two and everybody is standing or sitting between those two persons, no one else heard it, and the Court has some doubt that statement was even made. **Even if it were made, it's not entirely improper to suggest that witnesses might have rehearsed their testimony.**

Id. at p. 201 (emphasis added).

For this action, Petitioner also submitted the original and redacted tapes of Bennis's and

30

Dr. Harlan's trial testimony. (Docket Entry Nos. 31, 33). The Court has played these tapes at the maximum level, but is unable to find that those tapes clearly support the petitioner's assertions about these two remarks. Petitioner did not present the alleged comment during Dr. Harlan's testimony in his post conviction appeal to the Tennessee appellate court. Supra at pp. 24-25.

Assuming the remarks were made, at the time of Petitioner's trial, a prosecutor's comment on his personal belief about a witness's testimony is improper. United States v. Young, 471 U.S. 1, 8-10, 17-18 (1985), but to set aside a conviction, such comments must "seriously affect[] the fairness of the trial. Id. at 20. The Court considers the state courts' ruling on Bennis remark to be reasonable because that is the only state court to consider this claim. The state trial court's finding that this claim lacks a factual basis is reasonable as neither the state trial court nor Petitioner's trial counsel heard the purported remark. The trial court also ruled the claim to be meritless assuming the remark was made. The Court concludes that the proof does not establish Fann's remark during Dr. Harlan's examination. Petitioner's trial counsel cannot be held accountable for a prosecutor's remark that he did not hear, and Petitioner has not clearly proved in this remark was made. Considering the entire record in this action, this Court concludes that the state trial court's disposition is not unreasonable and this claim lacks merit.

### b. The "Blood Splatters" Argument

Petitioner's next claim concerns the prosecutor's closing argument that Petitioner's shirt had "blood spatters": "We're not taking about transfer blood. We're not talking about smears of blood. We're talking about blood spatters, what happens when somebody pulls a trigger and blows somebody's brains out and blood spatters." (Docket Entry No. 6, Addendum 1, Volume 5 at p. 590).

On the blood issue, on direct appeal, the Tennessee appellate court found that: "Red splatters on the appellant's t-shirt, which he explained as spaghetti sauce, were later determined to be human blood." 1999 WL 219629 at *2. That Court also cited as evidence of Petitioner's guilt that "the presence of human blood on the appellant's t-shirt, despite his explanation that the stains were spaghetti sauce." Id. at *3. The state's expert referred to the blood on Petitioner's t-shirt as "small spots" of human blood. (Docket Entry No. 6, Addendum 1, Volume 4 at p. 415). The expert did later refer to finding "a spot of blood" that "was probably about an eighth of an inch in a circle, id. at p. 416, but clarified that "I don't know when that spot or the other spot got on there." Id. at p. 418. One of these blood spots was on the front center near the neck of the Petitioner's tee shirt and the other spot was on the shoulder of Petitioner's tee-shirt. Id.

Petitioner's claim is that the prosecutor's wrongful mischaracterization misled the jury that several spatters of blood were on Petitioner's shirt. The state trial record reflects that in fact, Petitioner had two blood spots on his shirt in two different areas of Petitioner's tee shirt: the neck and shoulder areas. A prosecutor can make closing argument based upon evidence in the record and reasonable inferences therefrom. Young, 470 U.S. at 9, n.7; Byrd v. Collins, 209 F.3d 486, 546 (6th Cir. 2000). With these facts, the prosecutor's references to the two blood spots as blood splatters has some factual support in the record and therefore are not beyond reason as reflected by the Tennessee appellate court's reference to the "red splatters" on the Petitioner's tee-shirt. This claim lacks merit.

### c. The Gun Residue-Washing Hands Argument

As to the gun residue, Petitioner next cites the prosecutor's argument that Walker had "minute amounts of gunshot residue on his hands," (Docket Entry No. 6, Addendum 1, Volume 5

at p. 585), as beyond the State's expert actual testimony. Petitioner had ordinary trace amounts of antimony and barium on Petitioner's hands, but the State's expert concluded that "gunshot residue" was "absent" from Petitioner's hands. (Docket Entry No. 6, Addendum 1, Vol. at pp. 391-93, 404. Thus, Petitioner contends that prosecutors' use of the phrase "gunshot residue" was wrong and inaccurate and misled the jury that physical evidence supported the State's theory, citing Hamblin v. Mitchell, 354 F.3d 482, 495 (6th Cir. 2003) (reversible error if prosecution argues facts beyond those confirmed by expert). The State prosecutors also argued that Petitioner removed the gun residue evidence during the two minutes between Patzer's 911 call and the officers' arrival at the murder scene:

> Do you know what he was doing [during that two minutes]? He was wiping fingerprints off the gun, if I can just look at the pictures here for just a minute. He's out here wiping the fingerprints off the gun. **He's out here washing his hands so there won't be any gunpowder residue on it. And he's out here planting the holster over here . . . He was washing off that gun, washing of his hands, or cleaning off that gun and washing off his hands. . . But unfortunately for him he didn't have time enough to do everything he wanted to do. When you hear a police siren coming, can you imagine** — (Interrupted)

Id. at pp. 582-83 (emphasis added). Defense counsel objected for lack of evidence, but the trial court ruled that the prosecutor was expressing the State's theory. Id. at p. 584.

As to the prosecutor's argument about the gun residue and Petitioner washing his hands to destroy any residue, Tennessee appellate court found:

> **Testimony established that there was minimal gunshot residue on Mr. Harp, and what residue that was found was limited to Mr. Harp's palms. Although Petitioner's gunshot residue analysis was returned negative, the State's expert witness also testified that very minimal particles of antimony and barium were found on Petitioner's hands. This residue, however, was so minimal that its presence did not alter the test's conclusions, nor could the expert say where the Petitioner had acquired such elements. When asked why a person might not have gunshot residue on their hands, the expert witness testified that**

33

**washing one's hands could eliminate any residue.**

The testimony also showed that Petitioner was alone in the trailer after the shooting for a period of approximately two minutes between the time Ms. Patzer locked herself in the bathroom and the police arrived. **Fresh water puddles were found around the sink. No fingerprints were found on the gun**, and Howard Harp was lying on the floor, mortally wounded. From this evidence, the State argued that Petitioner might have washed his hands at the sink and wiped off the fingerprints.

Finally, Petitioner argued at trial that Mr. Harp shot himself, but the tests performed on Mr. Harp showed that gunshot residue was present only on his palms. Accordingly, the State argued that Mr. Harp did not pull the trigger, but rather had thrown up his hands to ward off the shot.

**The post-conviction court concluded, after a review of the record, that the State's proposed inferences were reasonably drawn from the evidence presented at trial,** and Petitioner did not present clear and convincing evidence at the post-conviction hearing to support his claim that such inferences were improper, or that the inferences, when taken together, either shifted or diluted the State's burden of proof. **The post-conviction court found that even if some of the inferences or questions to witnesses strayed beyond the permissible limit, Petitioner did not show that his defense was prejudiced, or that the trial results would have been any different, absent the objectionable arguments.**

2002 WL 31520654 at *11.   The trial record also reflects a question to the State's expert without objection, to which the expert explained that a person who had just fired weapon could remove gunshot residue by washing hands. (Docket Entry No. 6, Addendum No. 1, Volume 4 at pp. 386-87).

The Court adopts the same rationale on Petitioner's blood splatters claim to conclude that because the state prosecutor had a factual basis in the state trial record for this latter argument, the argument was permissible and the trial court's ruling was reasonable. As to the argument about some residue on Petitioner's hand, when considered with the other portions of the prosecutor's argument and the evidence at trial, the former comment did not compromise the fundamental

34

fairness of the petitioner's trial.

In sum, from the Court's review of the trial record, the prosecutor's closing arguments at issue have ties to factual record and therefore the Tennessee courts could reasonably conclude that the arguments are inferences from the evidence at trial. Thus, Petitioner's trial counsel's failure to object to these remarks do not establish any ineffectiveness of counsel nor prosecutorial misconduct.

### d. Failure to Retain Expert

As to trial counsel's failure to secure an expert on the gun residue, the Tennessee appellate court on the post conviction appeal found that:

> Next, petitioner also alleged ineffective assistance of counsel because of counsel's failure to call expert witnesses to refute the prosecution's evidence on latent fingerprints, gunshot residue and blood analyses, and a psychosocial expert to testify as to Mr. Harp's mental state and suicidal tendencies on the day of the shooting. He also alleges counsel was ineffective for not calling as a witness the admitting personnel on call the night Mr. Harp was brought into Erlanger Hospital. At the post-conviction hearing, Petitioner was not able to identify the name of the pertinent hospital, and could only speculate as to what the witness might say. Moreover, the Petitioner did not produce any expert witnesses at the post-conviction hearing to prove what the testimony at trial would have been, relying once again on speculation as to how the testimony might have helped Petitioner's defense.
>
> *       *       *
>
> . . . Without the production of any expert witnesses on Petitioner's behalf or the identification of the described hospital personnel, the post-conviction court found that the Petitioner did not present sufficient proof to support his claims. We concur with the post-conviction court's findings.

Walker, 2002 WL 31520654 at **11, 12, 13, 14.

Based upon these findings, Petitioner's trial counsel did not consider the State's expert about the blood spot on Petitioner's shirt to be harmful to the defense and also considered the lack

35

of gun residue on Petitioner to be helpful and inconsistent with Petitioner's shooting of the victim. Petitioner's counsel had identified an expert on gun residue, but in light of the State's proof, counsel deemed presenting such proof unnecessary. Under Strickland, this Court concludes that the State courts could reasonably conclude that Petitioner's trial counsel's strategic decisions on this claim are not shown to be ineffective or prejudicial.

### 5. Prosecutor's Interference with Witnesses

Petitioner's next claim is that Patzer testified at the preliminary hearing that Officer Lane told her to refuse to speak to the defense and that Patzer did refuse to do so through the day of the trial. The trial record reflects Patzer's actual trial testimony, "They told me I could talk to anybody that I wanted to. I chose not to talk [to the defense]." (Docket Entry No. 6, Addendum 1, Volume 3 at p. 167). As to her cited preliminary hearing testimony, Patzer testified that she had "misunderstood" Officer Lane's statement. Id. There is not any evidence presented to challenge Patzer's explanation. The Tennessee appellate court found defense counsel had Patzer's inconsistent statements and that this claim lacked factual merit. 2002 WL 31520654 at *12. There is not any evidence to challenge that finding.

"Certainly, the prosecution has no right to interfere with or prevent a defendant's access to a witness . . ." United States v. Scott, 518 F.2d 261, 268 (6th Cir. 1975). "Instructions to a witness not to cooperate with the other side or to talk to lawyers for the other side would not be proper." United States v. Matlock, 491 F.2d 504, 506 (6th Cir. 1974). This claim is unsupported when Patzer's testimony is read in complete context.

### D. Defaulted Claims

Petitioner has certain claims that the Respondent contends are procedurally defaulted

36

because those claims were not presented to the state courts in Petitioner's prior state proceedings and such claims are time-barred under the state's one year statute of limitations for post conviction claims. Tenn. Code Ann. § 40-30-102(a) and (c) 10 and Tenn. R. App. P. 36(a) for Petitioner's failure to raise these claims in the State appellate court. These claims are Petitioner's Brady claim and his prosecutorial misconduct claims based upon certain other statements in the prosecutor's closing argument.

### 1. **Brady** Claims

Petitioner's Brady claim is based upon Officer Demming's report that State prosecutors failed to disclose Demming's assessment of the alleged threat to Patzer at the Texas address on October 15, 1995. Demming's report, in pertinent part was as follows:

> Tuesday evening on the 15th I received a call from Patzer. She sounded very worried and asked if we had located Walker. She gave some information on where he might be found. This was approx. 2:00 a.m. when she contacted me. At approx. 5:00 a.m. Patzer called back and asked for me. I was not at the station but she left a message saying I could not reach her at the number she had left previously. **Then a male subject called from the same place Patzer had called from. After speaking with Sgt. Dukes, we felt Patzer maybe in danger**. Officer Lee [Walker] , Sgt. Dukes and myself went to 1551 Texas. We made contact with Patzer. She said Walker had just left. She was terrified. I transported her to the CPD. I contacted Det. Lane and he arrived at the CPD a short time later.

(Docket Entry No. 74-2, Cookeville Police Department, Demming's Narrative at p. 18) (emphasis added). Demming's report was not disclosed to the defense, but Demming relayed her assessment to Fann, one of the State's prosecutors, who testified that Demming opined that she "didn't know whether to believe [Stacy Patzer] or not." (Docket Entry No. 73-1 Fann Deposition at p. 28).

In an affidavit dated July 24, 2007, Patzer now states that in fact Petitioner was not present at 1551 Texas Avenue on October 15th.

37

2. I was present when Howard Harp was fatally injured by a gunshot on Saturday, October 14, 1995, and I testified in the subsequent murder trial, State v. Lon Walker, that addressed that incident of October 14, 1995.

3. I gave a statement about the shooting to Cookeville Police Department officers on the night of the incident.

4. **On the Monday following the shooting incident, I drove to Jackson County with Lon Walker, and in the afternoon we returned to his trailer in Cookeville. Officer Lane arrived at Walker's trailer. When Walker realized Officer Lane was there, he ran off into the woods, and I did not see or speak to Walker again until after his arrest.**

5. I then went voluntarily with Officer Lane to the Cookeville Police Department. I did not give a statement that same day. I spend two days living in the police station. I was fully sobering up - I ate, showered, and slept there in the police station itself. During that period, Officer Yvette Demming spoke to me a few times without questioning me, and so did Officer Lane. After I had slept at least one night in a downstairs room in the police station, when the alcohol was completely out of my system, I was interviewed in an interview room by Officer Land and another officer. My interview and statement were videotaped.

(Docket Entry No. 50-2, Patzer Affidavit at pp. 1-2) (emphasis added). The contemporary police report was that Patzer was taken to a local motel on October 15th for her safety. (Docket Entry No. 74-2, Cookeville Police Department, Demming's Narrative at p. 18). Officer Lane explained that the police station does not have beds for persons to sleep in, (Docket Entry No. 73-2, Lane Deposition at p. 23), but the station does have a shower. Id. at p. 21.

Petitioner's specific contention is that Demming's assessment of Patzer's report of Petitioner's threat at the Texas residence is exculpatory because in Petitioner's view, the State advanced an intimidation theory based primarily on Officer Demming's report. Petitioner cites an officer's testimony that: "And I did notice, though, that when she would walk down to the end [of the hall of the police station] where [Walker] was at, Lon [Walker] kept seemed like he wanted to

38

talk to her. And I would - I tried to say pretty close to them and every time I'd walked down there

he would, you know, quieten down and I didn't understand what was going on, you know, what

he was saying." (Docket Entry No. 6, Addendum 1, at p. 421). This testimony was by Mark

Webb, a lieutenant with the Cookeville police department who described events of October 14,

1995 at the murder scene. Id. at pp. 419-21. In fact, Petitioner's trial counsel raised the Texas

Avenue incident in his cross-examination of Demming who testified at trial "I don't know

whether [Walker] was there [at 1551 Texas Avenue] or not." (Docket Entry No. 6, Addendum 1,

Demming Trial Transcript at p. 461.

Respondent contends that any Brady claim is procedurally defaulted as time-barred under

federal law and Tenn. Code Ann. § 40-30-102(a) and (c) as well as Tenn. R. App. P. 36(a), for

Petitioner's failure to raise this claim in the state courts. In addition, Respondent argues that

Demming's opinion of this October 15th incident is not Brady material.

Under 28 U.S.C. § 2244(d)(1), habeas petitioners are allowed a one-year limitations period

for the filing of § 2254 petitions running from the "[t]he date on which the judgment became final

by the conclusion of direct review of the expiration of the time for seeking such review." 28

U.S.C. § 2244(d)(1)(A). The one-year period is tolled during the time that "a properly filed

application for State post-conviction or other collateral review with respect to the pertinent

judgment or claims pending." 28 U.S.C. § 2244(d)(2). Petitioner's state conviction "became

final" under 28 U.S.C. § 2244(d)(10(A) on January 9, 2000, after the time for filing a petition for

writ of certiorari in the United States Supreme Court expired. The pendency of a federal habeas

action does not toll the limitation period for filing of a federal habeas claim. Duncan v. Walker,

533 U.S. 167, 181-82 (2001).

39

Under § 2244(d)(1)(A), Petitioner had to file his habeas petition by January 9, 2001. After 39 days, on February 17, 2000, Petitioner filed his state post-conviction proceeding that tolled the federal limitations period until March 17, 2003, when the Tennessee Supreme Court denied Petitioner's application for permission to appeal his post-conviction appeal. On February 6, 2004, when Petitioner filed this action, the remaining 326 days of the one year period had expired. This Brady claim was not asserted until August 14, 2007. Because this Brady claim was not filed until 2007, this claim is time barred under the federal limitations period for habeas actions.

Under certain conditions, the relation back doctrine under the Fed. R. Civ. P. 15(c)(2) can apply in a federal habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period. Mayle v. Felix, 545 U.S. 644, 649 (2005). Under Mayle, a claim outside the limitation period may relate back to the date of the original complaint, if claims "ar[i]se out of the same conduct, transaction or occurrence." Yet, the proposed claim must be tied to a "common core of operative facts" in the original pleading. Id. If the proposed claim is separate and distinct in time and in type, the amended petition with the proposed claim cannot relate back to the date of the original petition. Petitioner's Brady claim does not relate to the only possible claim in the original petition or first amended petition in this action.

A Brady can qualify as cause to excuse a procedural default, and a similar standard applies as the Sixth Circuit stated:

> Suppression or favorable impeaching evidence by the state that results in an inability to raise claims relating to that evidence in state court establishes cause for the ensuing default. Id. The petitioner need not show that the prosecutor acted in bad faith or that defense counsel made a specific request for evidence . . . However, unless the alleged Brady evidence is "material" for the purposes of the Brady rule, its "suppression d[oes] not give rise to sufficient prejudice to overcome the procedural default." (quoting Strickland v. Greene, 527 U.S. 263, 282 (1999).

40

Hutchinson v. Bell, 303 F.3d 720, 741 (6th Cir. 2002).

In Brady, the Supreme Court held that the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Later, the Supreme Court restated the elements of a Brady violation. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

To warrant federal habeas relief on this claim, this evidence must satisfy the standard that Petitioner's trial resulted "in a verdict unworthy of confidence" i.e., "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict based upon a "'. . . reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Strickler, 527 U.S. at 289, 290 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995).

Demming's report reflects Patzer's statement inquiring about Petitioner's whereabouts and the subsequent call by a male after Patzer's telephone call. The opinions and perceptions of Demming are based upon facts other than Patzer's statements. Demming's comment to Fann is her perception of whether Patzer faced a threat and Demming's uncertainty of that threat. In any event, Patzer's statements in her 2007 affidavit are consistent with Demmons's report that

41

Petitioner had left by the time of the officers' arrival. For this claim, Petitioner cites <u>Mathis v.</u> <u>Berghuis</u>, 90 Fed. Appx. 101 (6th Cir. 2004), where the prosecution failed to disclose police reports of the victim's prior allegations of misconduct earlier. The Sixth Circuit concluded that, given the importance of the alleged victim's credibility, a reasonable probability existed that the non-disclosed evidence would have made a difference in the outcome of the defendant's trial. <u>Id.</u> Yet, Demming's cited statement is her perceptions, not Patzer's statements, and that perception was based upon facts other than Patzer's statements, namely the male person who called after Patzer called Demmons. <u>Mathis</u> is factually wholly inapposite. In any event, Patzer's prior inconsistent statements were before the jury. Thus, the Court also concludes that this proof on Petitioner's <u>Brady</u> claim does not establish cause to justify his procedural default on this claim.

For these claims, Petitioner cites additional remarks and arguments of State prosecutors that Petitioner asserts are improper vouching for witnesses' credibility, argument unsupported by facts and derogatory remarks about defense witnesses. Petitioner also cites a prosecutor's assertions that Petitioner knew Harp was suicidal and that Petitioner and Harp were friends.

- "Everybody in the world that knew the victim in this case and knew this family, including his friend, Mr. Harp, his drinking buddy, know that Howard Harp had threatened and attempted suicide on numerous other occasions," and

- "The defendant over here who was jealous, who knew this young man [Harp] had a tendency to try, to threaten, to attempt suicide,"

(Docket Entry No. 6, Addendum 1, Volume 5 at pp. 569, 579.

Petitioner next challenges the prosecutor's reference about human psychology principals that were not in evidence.

42

> I want to read to you just one statement from a book that I thought kind of hit that
> on the head as far as Ms. Patzer, Stacy Patzer. This little quote is from a book by
> Daniel Borstein that he wrote or that was published in 1961. The name of it is
> "The Image." And he said that 'Almost anything can be made to seem true,
> especially if we wish to believe it.'

Id. at p. 592. Petitioner asserts this reference to human psychology in light of Patzer's testimony

was very misleading and defense counsel should have objected to it. Petitioner next challenges

Sells statement that: "Mr. Walker is a very clever and a very cunning, very heartless . . . He has

not remorse," and is "cold-blooded." Id.

Petitioner next contends that the prosecutor told the jury that Officer Lane "has done an

excellent job in this case investigating this case, and we are just asking you to find the truth." Id.

at p. 594. Petitioner contends that prosecutors were asserting that because Lane deemed Petitioner

guilty after his review of the case, jury should also. Fann vouched Officer Lane as supporting the

prosecution because: "Officer Lane told you that he had 154 active cases. Ladies and gentlemen,

if this had been a suicide, he probably would have been happy to fold his case file up and let it go.

But, as Mr. Cameron said, we're after justice." Id. at 649.

Petitioner contends that these statements violate "the established rule that the personal

opinion of counsel has no place at trial," United States v. Bess, 593 F.2d 749, 753 (6th Cir. 1979),

and that it is "it is improper for a prosecuting attorney in a criminal case to state his personal

opinion concerning the credibility of witnesses or the guilt of a defendant." Byrd, 209 F.3d at 529.

Finally, Petitioner contends that without objection by his trial counsel, the prosecutor

commented on Petitioner's right not to testify by stating:

> He [Walker] admits that he lied [about whether the gun was his]. Well, he didn't.
> Mr. Cameron [his attorney] admitted it for him that he lied about the gun not being
> his and that he'd never seen it before. Well, when did he admit that he lied? We

43

> don't know but I can tell you this; I can tell you why. Because he was proved to be
> a liar right here in this courtroom.

(Docket Entry No. 6, Addendum 1, Volume 5 at p. 638). The trial court twice informed the jury

that the defendant did not have to testify and also that no adverse inference or consideration could

be given to the defendant's failure to testify. (Docket Entry No. 6, Addendum1, Volume 6 at pp.

659. 670-71). A related claim is Fann's objection to Willie Bennis testifying about Petitioner's

statement that ". . .now we're going to object to anything that Lon said. There are other ways that

they can introduce that if they want to." Id. at p. 527. Yet, these claims also were not presented to

the state appellate court. The comment claim was raised before the state trial court in Petitioner's

post-conviction petition, but was not raised in his appellate brief in the post-conviction appeal.

Supra at pp. 24-25. Compare also Walker, 2002 WL 31520654 at *9 (listing his ineffective

assistance of counsel claims in his post conviction petition before the trial court) with Walker,

2002 WL 31520654 at *10 (summarizing those claims on appeal).

    The exhaustion rule requires that the facts and federal legal theory raised in a petition for

the federal writ of habeas corpus must have been "fairly presented" to the state courts. Duncan v.

Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (citing Picard v. Connor, 404 U.S. 270, 275

(1971) and Anderson v. Harless , 459 U.S. 4, 6 (1982) (per curiam). The state courts must be

provided with a "fair opportunity" to apply controlling legal principles to the facts bearing upon the

petitioner's constitutional claim. Harless, 459 U.S. at 6. "It is not enough that all the facts

necessary to support the federal claim were before the state courts or that a somewhat similar state-

law claim was made," id., "a federal habeas petitioner ... [must] provide the state courts with a

`fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional

Case 2:03-cv-00096   Document 90   Filed 12/14/09   Page 44 of 56 PageID #: 780

claim." Id. A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Id. at 7-8 n.3.

Here, Petitioner did not present any of the facts of these prosecutorial misconduct claims as independent federal claims of prosecutorial misconduct to the state courts. See supra at pp. 24, 25. Thus, these prosecutorial misconduct claims are subject to procedural default. As a matter of federal law, to avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. Covington v Mills, 110 Fed. Appx. 663, 666 (6th Cir. 2004).

The "Procedural Default Doctrine" bars consideration of a federal claim in a habeas action that was not presented to the state court or was decided on state law grounds.

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would, therefore, be advisory. . .
>
> ***
>
> . . . the doctrine applies also to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural ground.

Coleman v. Thompson, 501 U.S.722, 729-30 (1992) (emphasis added and citations omitted).

Yet a presumption of no procedural default arises if the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy

45

and independence of [the] state law ground is not clear from the face of the opinion." Id. at 735. Further, this doctrine applies only to "firmly established" and regularly followed state procedural rules. Ford v. Georgia, 498 U.S. 411, 423-24 (1991); Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Moreover, if there is no state court determination of whether a petitioner's claims are procedurally defaulted under state law, then the District Court is to consider whether the state court would bar the claims if presented to them. Engle v. Isaac, 456 U.S. 107, 125-26, n.28 (1982). Here, Respondent cites Tenn. Code Ann. § 40-30-102 (a) and (c) that has a one year limitation period that has long since passed and Tenn. R. App. P. 36 (a) requiring preclusion for failure to present a claim in a prior appeal.

The procedural default doctrine may not preclude federal habeas review if failure to hear the petitioner's would result in a fundamental miscarriage of justice or actual innocence. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). If there were an error-free trial and the actual innocence claim was based upon newly discovered evidence, then the petitioner's showing of actual innocence must be "truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the lack of an available state remedy. Herrera v. Collins, 506 U.S. 390, 427 (1993).

Actual innocence claims must be substantive or factual, not procedural, e.g., a claim of innocence based on ineffective assistance of counsel or a prosecutor's failure to disclose Brady material is procedural and subject to the procedural default doctrine. Schlup v. Delo, 513 U.S. 298 (1995). As the Court in Schlup explained, "if there were no question about the fairness of the criminal trial, a Herrera type claim would have to fail unless the federal habeas court is convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raise sufficient doubt about [the

46

petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims." Id. at 317.

Where the claim of actual innocence is premised upon a trial with error, then a different and lesser standard of judicial review of "sufficient doubt" applies. As the Supreme Court stated in Schlup, in contrast to Herrera, where a petitioner

> . . . accompanies his claim of innocence with an assertion of constitutional error at trial. For that reason, [petitioner's] conviction may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial. Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner such as [the petitioner] presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

> Consequently, [petitioner's] evidence of innocence need carry less of a burden. In Herrera, (on the assumption that petitioner's claim was, in principle, legally well founded), the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" even if his conviction was the product of a fair trial. For [petitioner], the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial.

Id. at 316.

In Schlup, the Court addressed the standard of proof that a federal petitioner would have to show to establish the actual innocence exception to the procedural default rule in non-capital cases. In contrast, for cases other than death penalty cases, the Court in Schlup applied the standard in its earlier Carrier decision stating,

[W]e hold that the Carrier "probably resulted" standard rather than the more

47

stringent Sawyer standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

The Carrier standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U.S. at 496, 106 S.Ct. at 2649-2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary," McCleskey, 499 U.S. at 494, 111 S.Ct. at 1470, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

Several observations about this standard are in order. The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The Carrier standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068. Indeed, even in Sawyer, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under Sawyer, or is

48

deciding whether a petitioner has made the requisite showing of innocence under Carrier, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

Id. at 326-28.

Here, for the same reasons stated on the Petitioner's sufficiency of the evidence claim and his Brady claim, the Court concludes that Petitioner has not met the standard under the actual innocence doctrine to excuse his procedural defaults. Moreover, as to Petitioner's claim that the prosecutor commented on his right not to testify without objection by his counsel, a prosecutor's comment on a defendant's failure to testify violates the defendant's Fifth Amendment privilege against self-incrimination. Griffin v. California, 380 U.S. 609, 615 (1965). Yet, a prosecutor's closing argument in response to statements of a defendant's counsel is permissible, Lockett v. Ohio, 438 U.S. 589, 595 (1978), as is a prosecutor's argument based upon the evidence at trial and inferences therefrom. Young, 470 U.S. at 9, n.7. In any event, Petitioner must demonstrate that the prosecutor "manifestly intended" to comment on the Petitioner's right not to testify. Lent v. Wells, 861 F.2d 972, 975 (6th Cir. 1988) and if a prosecutor has "some other explanation for his remark, there is not Fifth Amendment violation. Id. Given Petitioner's statements to the police denying ownership or ties to the murder weapon and stating that the spots on the t-shirt were spaghetti sauce coupled with Petitioner's trial counsel's statement about the gun, under Young, Lockett and Lent these statements provide "some other explanation" for the prosecutor's cited statement. That claim would not excuse a procedural default.

The standard analysis for procedural default was set forth by the Sixth Circuit in the oft-cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

When a state argues that a habeas claim is precluded by the petitioner's failure to

49

observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

\*\*\*

Second, the court must decide whether the state courts actually enforced the state procedural sanction.

\*\*\*

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.... This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Maupin, 785 F.2d at 138 (citations omitted)

## 1. Noncompliance with Applicable State Rules

Under Harris, any reliance on a state rule must be express, i.e., supported by citation to a state law or court rule as well as a showing of how the facts of the case violate that rule. Otherwise, federal review is not barred.

We believe that when a state appellate court applies a procedural bar that has no foundation in the record or state law, the federal courts need not honor that bar. We do not by this holding sanction blanket federal court review of state procedural rulings, rather the rule is to ensure that the state courts do not block federal vindication of federal constitutional rights by procedural rulings that have no basis in state law or the facts of the particular case.

Walker v. Engle, 703 F.2d 959, 966 (6th Cir. 1983). Respondent relies upon a clear statute of limitations to bar these claims. Tenn. Code Ann. § 40-30-102(a) and (c) and Tenn. R. App. P. 36 (a).

## 2. "Firmly Established" and "Regularly Followed" State Rules

50

As noted earlier, to qualify for the procedural default rule, the cited state law also must be a firmly established and regularly followed state practice. Ford, 498 U.S. at 423-24.

The Supreme Court recognized the following state interests as constituting adequate grounds for state procedural rules.

> The possible avoidance of an unnecessary trial or of a retrial, the difficulties of making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, and the potential disruption to the numerous convictions of finding a defect in a grand jury only after the jury has handed down indictments in many cases.

Coleman, 501 U.S. at 745-46.

Another reason to support a finding of adequate state rules was decided in Frances v. Henderson, 425 U.S. 536 (1976), where the Supreme Court enforced a state rule that promoted finality, noting a comparable federal rule.

> Plainly the interest in finality is the same with regard to both federal and state prisoners. ... There is no reason to ... give greater preclusive effects to procedural default by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

425 U.S. at 541-42.

Procedural rules such as statutes of limitations have been found to be independent and adequate. In Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. In Brown v. Allen, 344 U.S. 443 at 485-86 (1953), the Court also applied the procedural default rule to a state rule that placed time limits on appellate rights. Accord Reed v. Farley, 114 S.Ct. 2291 (1994) (denying writ due to waiver of delay under the Interstate Agreement on Detainers by failure to object at trial and to establish prejudice).

51

In <u>Hutchison v. Bell</u>, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and <u>Burford</u> exception in a procedural default analysis:

> Hutchison argues that Tennessee courts' willingness to excuse procedural default pursuant to <u>Burford</u> demonstrates that state procedural rules are not regularly followed in the context of later-arising claims.
>
> Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in <u>Burford</u> and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented . . .
>
> In <u>Hannah v. Conley</u>, 49 F.3d 1193 (6 th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. <u>Id.</u> at 1197. The <u>Hannah</u> court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. <u>Id.</u> at 1196. The current one-year statute of limitations contains the same mandatory language. <u>See</u> T.C.A. § 40-30-202(a).
>
> Although the previous cases did not present a <u>Burford</u> type later arising claim, we do not find that the state's <u>Burford</u> tolling rules command a different result. . . .
>
> Given that tolling under <u>Burford</u> is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the <u>Burford</u> exception does not render Tennessee's procedural rules inadequate.

<u>Id.</u> at 738-739. (footnotes omitted).

The Sixth Circuit also ruled in <u>Hutchinson</u> that despite the <u>Burford</u> exception to the Tennessee timeliness rule, <u>Burford</u> was not a separate constitutional claim. <u>Id.</u> at 740-41.

In a word, <u>Hutchinson</u> found the Tennessee limitations rule to constitute a firmly established and

regularly followed state law. Thus, the Court concludes that Tennessee's limitations statute is an

independent and regularly enforced state rule. This conclusion renders consideration of Tenn. R.

App. P. 36(a) moot.

Once procedural default on a state rule is established, the federal petitioner must establish

cause and prejudice to excuse such non-compliance. The "cause" for the default must be external

to the petitioner and must otherwise be attributable to the state.

> . . . we think that the existence of cause for a procedural default must ordinarily turn
> on whether the prisoner can show that some objective factor external to the defense
> impeded counsel's efforts to comply with the State's procedural rule. Without
> attempting an exhaustive catalog of such objective impediments to compliance with
> a procedural rule, we note that a showing that the factual or legal basis for a claim
> was not reasonably available to counsel, see Reed v. Ross, 468 U.S., at 16, or that
> 'some interference by officials,' Brown v. Allen, 344 U.S. 443, 486 (1953), made
> compliance impracticable, would constitute cause under this standard.

Carrier, 477 U.S. at 488 (emphasis added).

An often cited factor to establish cause for a procedural default is the petitioner's state

counsel's failure to raise an issue or to comply with a state law to present a given habeas claim.

Inadequate counsel can prove cause, but only if counsel's conduct violates Sixth Amendment

standards and counsel's inadequate conduct has been presented to the state courts.

> So long as a defendant is represented by counsel whose performance is not
> constitutionally ineffective under the standard established in Strickland v.
> Washington, supra, we discern no inequity in requiring him to bear the risk of
> attorney error that results in a procedural default.
>
>                     ***
>
> Similarly, if the procedural default is the result of ineffective assistance of counsel,
> the Sixth Amendment itself requires that responsibility for the default be imputed to
> the State, which may not 'conduc[t] trials at which persons who face incarceration
> must defend themselves without adequate legal assistance.' Cuyler v. Sullivan, 446
> U.S. 335, 344 (1980). Ineffective assistance of counsel, then, is cause for a

53

procedural default. However, we think that the exhaustion doctrine, which is `principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings,' Rose v. Lundy, 455 U.S. 509, 518 (1982), generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. The question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause---a question of federal law---without deciding an independent and unexhausted constitutional claim on the merits. But if a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill-served by a rule that allowed a federal district court `to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' Darr v. Burford, 339 U.S. 200, 204 (1950), and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

Carrier, 477 U.S. at 488-89 (emphasis added).

The Supreme Court emphasized in Coleman that mere attorney error cannot be cause and cannot be attributable to the state.

Attorney ignorance or inadvertence is not `cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must `bear the risk of attorney error.' ... Attorney error that constitutes ineffective assistance of counsel is cause, however ... as Carrier explains, `if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state.' [quoting Carrier, 477 U.S. at 488]. In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., `imputed to the state.'

Coleman, 501 U.S. at 753-54 (emphasis added).

As noted earlier, the standard for cause attributable to counsel is the constitutional standard under the Sixth Amendment for attorney performance, i.e., whether counsel provided "reasonably

54

effective assistance," Carrier, 466 U.S. at 687, and counsel's performance must be both inadequate and prejudicial to the defense. In Wainwright v. Torna, 455 U.S. 586 (1982), the Supreme Court made it clear that ineffective assistance of counsel could not be grounds for cause where the proceeding in which the error occurred was not one for which counsel was constitutionally required. Under Ross v. Moffitt, 417 U.S. 600 (1974) and Pennsylvania v. Finley, 481 U.S. 551 (1987) that the right to counsel does not extend beyond the first appellate process. Thus, counsel errors in state post-conviction proceedings are not grounds for cause because there is no right to counsel for these proceedings. Ritchie v. Eberhart, 11 F.3d 587, 591-92 (6th Cir. 1993). As the Court explained in Coleman,

> [W]e decline . . . to extend the right to counsel beyond the first appeal of the criminal conviction. We held in Ross that neither the fundamental fairness required by the Due Process Clause nor the Fourteenth Amendment's equal protection guarantee necessitated that states provide counsel in state discretionary appeals where defendants already had one appeal as of right. ... Similarly, in Finley, we held there was no right to counsel in state collateral proceedings after exhaustion of direct review. ... Given that a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review, it would defy logic for us to hold that Coleman had a right to counsel to appeal a state collateral determination of his claims of trial error.

> Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.

Coleman, 501 U.S. at 756-57.

For the reasons stated on Petitioner's ineffective assistance of counsel claims and his Brady claim, the Court concludes that Petitioner has not demonstrated cause for his failure to present his defaulted claims to the State courts. This same rational leads the Court to conclude that Petitioner has not established prejudice for these defaults.

55

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ____14th____ day of December, 2009.

WILLIAM J. HAYNES, JR.
United States District Judge